UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHRYN LLEWELLYN-JONES,
MARK LLEWELLYN-JONES, CAROLINE
JONES, PETER GREEN, LESLY GREEN,
SAID FADEL a/k/a SAEED FADHT,
WARREN GROVER and MARGARET
JOYCE-GROVER,

        CIVIL ACTION NO. 13-11977

        Plaintiffs,

        DAVID M. LAWSON

v.        DISTRICT JUDGE

METRO PROPERTY GROUP, LLC, a       R. STEVEN WHALEN
Michigan limited liability company,      MAGISTRATE JUDGE
METRO PROPERTY MANAGEMENT,
LLC, a Michigan limited liability company,
GLOBAL POWER EQUITIES, LLC, a
Michigan limited liability company,
APEX EQUITIES LLC, a Michigan
limited liability company, SAMEER
BEYDOUN, ALI BEYDOUN, TAREK
MAHMOUD BAYDOUN a/k/a TAREK M.
BAYDOUN a/k/a TAREK BEYDOUN,
BAYDOUN LAW GROUP, PLLC, a
Michigan limited liability company, d/b/a
THE MERIDAN LAW GROUP, MIKE
ALAWEIH, DAVID MAKKI, CHRIS
PICCIURRO, KATHY MESSICS, GEORGE
VANDERBURG, ALLEN BROTHERS
ATTORNEYS AND COUNSELORS
PROFESSIONAL LIMITED LIABILITY
COMPANY, a Michigan limited liability
company, JAMES ALLEN and JOHN ALLEN,
jointly and severally,

        Defendants.

_____/

-1-

## REPORT AND RECOMMENDATION

Before the Court is Defendant/Counter-Plaintiff Metro Property Group LLC's ("MPG's") Motion for Preliminary Injunction [Docket #9], which has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons discussed below, I recommend that the Motion be DENIED.

## I. BACKGROUND FACTS

This case involves breach of contract and fraud-related claims made by foreign investors purchasing various properties within the City of Detroit. Plaintiffs, five of whom are citizens of the United Kingdom, along with one from the Republic of Yemen and two from Australia, filed suit on May 3, 2013, alleging fraudulent misrepresentation, fraud in the inducement, breach of contract, unjust enrichment, and conversion, as well as violations of the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.101 *et seq.*, civil racketeering pursuant to Racketeering Influenced and Corrupt Organizations Act ("RICO"), and intentional infliction of emotional distress ("IIED"). The Defendants are Metro Property Group, LLC ("Metro Property Group"), Metro Property Management, LLC, Global Power Equities LLC, Apex Equities, LLC, Sameer Beydoun (Chief Executive Officer of the above entities), Ali Beydoun (Chief Operating Officer of Metro Property Group), as well as the following individual performing various functions for Metro Property Group: Mike Alaweih (Vice President of Construction Services), David Makki (Vice President of Real Estate Services), Chris Picciurro (Chief Financial Officer), Kathy Messics ("Client Care Director"), George Vanderburg ( "Director of Tenant Relations)," and Tarek Mahmoud Baydoun

-2-

("Tarek Baydoun")(general counsel). *Complaint* at ¶¶ 15-22. These individuals will henceforth be referred to as the Metro Property Group Defendants.

Plaintiffs also name Baydoun Law Group, PLLC, the law firm of Tarek Baydoun; Allen Brothers Attorneys and Counselors Professional Liability Company ("Allen Brothers"), a company with whom Tarek Baydoun is or was "of counsel;" and individuals James Allen and John Allen. *Id.* at ¶¶ 23-26. These individuals and entities will henceforth be referred to as the "law firm Defendants."[1]

### A. Allegations Pertaining to Metro Property Group Defendants

Plaintiffs allege that the Metro Property Group Defendants purchased mostly dilapidated, uninhabited properties for between $500 and $5,000, then made a profit by inducing investors to purchase these properties for between $40,000 and $50,000. *Id.* at ¶34. They allege that Defendants knew that the homes "will be unlikely to rent out to third parties because of their mostly undesirable and destitute locations," asserting that any rental payments would not cover the purchase price and cost of repairs. *Id.* at ¶ 35. Plaintiffs claim that Defendants "did not refurbish the homes [or] make any attempt to bring them up to code requirements for a certificate [of] occupancy" or "Section 8 requirements for habitability," contrary to Defendants' representations when marketing the properties. *Id.* at ¶36. Plaintiffs

---

[1]

Claims against Tarek Baydoun, General Counsel for Metro Property Group, include allegations that he participated in the underlying fraud by Metro Property Group as well as his involvement as the owner of Baydoun Law Group and his relationship with Defendant law firm Allen Brothers. Therefore, allegations against him are included in the discussion of both the Metro Property Group and "Law Firm" Defendants.

state that Defendant Mike Alaweih "never refurbished and/or repaired" any of the homes, "causing them to be fined thousands of dollars and forcing them to pay thousands of dollars for repairs to the properties they purchased . . ." *Id.*

Plaintiffs allege that these Defendants marketed the homes to "primarily foreign investors and retirees in foreign countries . . . who are unable and/or unlikely to make the overseas trip to visit Detroit to actually view the properties prior to purchasing them." *Id.* at ¶ 37.  They allege that on the occasions that the investors actually traveled to Detroit to view the houses, they were shown deliberately "staged" refurbished homes not representative of most of the homes sold, or, that Defendants made excuses for refusing to show investors the insides of homes or introducing them to the properties' tenants.  *Id.*  In addition, Plaintiffs allege that Defendants falsely stated that uninhabited homes were "tenanted," going so far as to fabricate financial information and the family status of non-existent tenants.  *Id.* at ¶¶ 38-9.

Plaintiffs accuse Tarek Baydoun of threatening a duped investor who challenged Defendants' business practices with criminal prosecution and up to 25 years in prison.  *Id.* at ¶ 40.  They allege that Metro Property Group Defendants engaged in a "Ponzi scheme" in which they would pay investors rents from non-existent "tenants" for the first few months after the purchase of the properties, then later claim that the tenant "stoped paying rent and had to be evicted and that . . . no further rent [would] be forthcoming until a new tenant [was] found." *Id.* at ¶¶ 41, 46.  Plaintiffs allege that "in most cases," Defendants did not attempt to procure a new tenant, making the property "a money pit and drain on resources."  *Id.*

Plaintiffs state that Metro Property Group Defendants Sameer Beydoun, Ali Beydoun, David Makki, Kathy Messics, and George Vanderburg either forged lease agreements or provided the forged documents to Plaintiffs. *Id.* at ¶¶ 41-42.

Plaintiffs state that although Defendants represented that the homes were "Section 8 approved," in fact most of the homes did not receive a Section 8 inspection and in one case, Plaintiffs Kathryn Llewellen-Jones and Mark Llewellyn-Jones were fined $5,761.80 for failing an inspection. *Id.* at ¶ 43.  Plaintiffs state that the individual Metro Property Group Defendants also forged documents purporting to show that the properties in question were "up to Section 8 standards." *Id.* at ¶ 47.

Plaintiffs allege that "Tarek Baydoun, Sameer Beydoun, Ali Beydoun, David Makki, and Mike Alaweih are all from families that are well known to be prominent supporters and members of Hezbollah in South Lebanon." *Id.* at ¶61.  Plaintiffs state that they "fear that the money from which they . . . have been defrauded by Defendants may have, in part, been laundered to Hezbollah." *Id.* at ¶ 62.

### B.  Allegations Concerning Law Firm Defendants

As to the "law firm" Defendants, Plaintiffs allege that Tarek Baydoun, General Counsel for the Metro Property Group entities, also had an "of counsel" relationship with Defendant law firm Allen Brothers. *Id.* at ¶ 52.  Plaintiffs state that Tarek Baydoun billed them for  non-existent evictions of "non-existent/fictional tenants" and trespassers. *Id.* at ¶ 53.  They allege that Tarek Baydoun's law firm, Baydoun Law Group d/b/a The Meridian Law Group ("Meridian"),  was housed in the same offices as the Allen Brothers, and the

offices of individuals James Allen and John Allen.  *Id.* at ¶ 54.  Plaintiffs allege that James Allen and John Allen "were aware or should have been aware" that Tarek Baydoun was involved in the above-alleged "illegal and fraudulent behavior." *Id.*  They state that James Allen also sent them threatening messages, noting that although Tarek Baydoun's name was removed from the Allen Brother's website in October, 2012, Meridian continues to be housed within the offices of Allen Brothers.  *Id.* at ¶ 55.

Plaintiffs request compensatory and punitive damages as well as attorney fees and costs.

### C.  Defendants Metro Property Group's Counter-Complaint

On July 30, 2013,  Defendants Metro Property Group, Metro Property Management, LLC, Global Power Equities LLC, and Apex Equities, LLC, henceforth collectively referred to as "MPG," filed a Counter-Complaint against Plaintiffs Kathryn Llewellyn-Jones and Mark Llewellyn-Jones ("Counter-Defendants") alleging tortious interference with contracts, business relationships and business expectancies. *Docket #8-9.*  MPG requests injunctive relief against Counter-Defendants, enjoining these individuals from "contacting, directly or indirectly, whether through direct contact or by any means of publication, any individual or company with whom [MPG] has a contract, a business relationship[] or an expectation of a business relationship, including [its] current and potential business partners and investors." *Docket #9* at 24.

MPG alleges that Counter-Defendants, unlike most of MPG's clients, purchased their three properties through a brokerage firm based in the United Kingdom known as USA

Property Direct. *Counter-Complaint* at ¶ 27. MPG alleges that Counter-Defendant Kathryn Llewellyn-Jones acted as a sales agent for other individuals as well as purchaser of the three properties. *Id.* at ¶ 28. MPG states that it had "limited or no contact with [Counter-Defendants] prior to purchase," alleging that Counter-Defendants' communications were mostly through USA Property Direct. *Id.* at ¶ 33. MPG alleges that Kathryn Llewellyn-Jones began to raise complaints about MPG's management of the properties in 2012, in response to which MPG employees "made numerous attempts to address" her criticisms. *Id.* at ¶ 35. MPG notes that Counter-Defendants' terminated its services in July, 2012. *Id.* at ¶ 36. MPG alleges that while Counter-Defendants continued to complain about the state of the properties, MPG "no longer had regular access to the properties . . ." *Id.* at ¶ 37. Nonetheless, MPG states that it continued to address concerns raised by Counter-Defendants. *Id.* at ¶ 38. Following negotiations, MPG allegedly offered to repurchase the properties, but the Llewellyn-Joneses "ceased settlement discussions and blocked further emails" after MPG hired the Defendant Allen Brothers law firm to represent them in the negotiations. *Id.* at ¶ 44.

MPG states that Counter-Defendants' attorney, Deborah K. Schlussel, "a television and radio personality who has made appearances on numerous right-wing oriented shows," maintains a website on which she "often expresses disdain towards followers of Islam." *Id.* at ¶¶ 46-48. Counter-Plaintiff states that Ms. Schlussel "has also made extremely negative comments" about followers of Islam, noting that Counter-Defendants acknowledged that Ms. Schlussel took the present case at a discount because she was "dedicated to bringing the

Baydouns down." *Id.* at ¶ 52.

MPG cites a November 29, 2012 email sent by Kathryn Llewellyn-Jones to a potential MPG investor, stating that MPG's actions were "highly illegal" and that "[n]one of the houses were refurbished, some were dangerous and almost derelict." *Id.* at ¶ 54.  MPG also cites an email by Ms. Llewellyn-Jones sent to "key individuals at a property investment firm" known "to be an important business partner" of MPG, threatening to hold the partner company liable for MPG's "sordid" actions. *Id.* at ¶ 55.  MPG alleges that Mark Llewellyn-Jones sent a letter to the same partner two days later stating that MPG's properties were "virtually worthless on the open market . . ." *Id.* at ¶ 57.  Counter-Defendants allegedly continued to reach out to MPG business contacts after Ms. Schlussel received a May 20, 2013 "cease and desist communication".  *Id.*  at ¶¶ 58-60.  On June 28, 2013 Kathryn Llewellyn-Jones sent an email to a local television journalist who had recently interviewed Sameer Beydoun.  *Id.* at ¶ 61.  MPG alleges that Counter-Defendants' agents/cohorts also made comments on social media sites parroting statements made by the Llewellyn-Joneses. *Id.* at ¶ 62.  MPG alleges that after the Llewellyn-Joneses' "smear campaign" began, they were informed by a potential investor that he would not be following through with the purchase of five properties.  *Id.* at ¶ 63.

MPG states that in particular, three of Counter-Defendants' statements "will be shown, through discovery and dispositive motion, to be false:"  (1) "'[a]ll homes sold by Metro Property Group have been subject to massive fines from the Detroit Housing Commission,'" (2)  houses sold by Metro Property Group are "'virtually worthless on the

open market'" and that none of the properties "'have produced a genuine rental income,'" and (3) none of the properties sold by MPG were refurbished. *Id.* at ¶¶ 64-67. MPG requests damages as well as a preliminary injunction enjoining Counter-Defendants from "contacting, directly or indirectly, whether through direct contact or by any means of publication, any individual or company with whom [MPG] has a contract, a business relationship[] or expectation of a business relationship, including [MPG's] current and potential business partners and investors." *Docket #9* at 24.

## II. STANDARD OF REVIEW

In determining whether to grant a preliminary injunction, a court must examine and weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002); *McPherson v. Michigan High School Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573.

Notwithstanding this balancing approach, however, the likelihood of success and irreparable harm factors predominate. Thus, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales*

*v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.").

The movant bears the burden of demonstrating their entitlement to a preliminary injunction, and its burden is a heavy one. A preliminary injunction is an extraordinary remedy, "which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.*; *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). The level of proof required to obtain a preliminary injunction "is much more stringent than the proof required to survive a summary judgment motion." *Id.*

"[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *County Sec. Agency v. Ohio Dept. of Commerce,* 296 F.3d 477, 485 (6th Cir. 2002). "'Any system of prior restraints of expression bears a heavy presumption against its constitutional validity,' and a party who seeks to have such a restraint upheld 'thus carries a heavy burden of showing justification for the imposition of such a restraint.'" *Id.* (citing *New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). "A prior restraint is permissible [only] if the restrained speech poses 'a grave threat to a critical government interest or to a constitutional right.'" *Id.* (citing *Procter & Gamble,* 78 F.3d 219, 225, 227 (6th Cir. 1996)).

-10-

# III. ANALYSIS

## A. Strong Likelihood of Success on the Merits

To prevail on a claim of tortious interference with a business relationship under Michigan law, a plaintiff must establish the following elements:

> (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted.

*Wausau Underwriters Ins. Co. v. Vulcan Development, Inc.* 323 F.3d 396, 404 (6th Cir. 2003)(citing *Clark v. West Shore Hospital,* 16 Fed. Appx. 421, 430 (6th Cir. 2001)).  As to the third prong, "intentional interference requires showing purposeful or knowing behavior and that the interference was either: (1) a per se wrongful act; or (2) a lawful act done with malice and unjustified in law for the purpose of invading the contractual rights or business relationships of another."  *Dana Ltd. v. American Axle and Mfg. Holdings, Inc.*  2013 WL 4498993, *28 (W.D.Mich. August 19, 2013)(citing *Wausau,* at 404).   However, "[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference."  *Mino v. Clio School Dist.,*  255 Mich.App. 60, 78-79, 661 N.W.2d 586, 597-598 (2003).

Counter-Defendants do not contest that MPG has met the first, second, and fourth elements of a tortious interference claim.  They claim, in effect, that they have a legitimate business interest in warning potential and current investors to avoid doing business with

-11-

MPG.  *Docket #12* at 20; *September 10, 2013 Hearing, Docket #41* at 30.  In addition to arguing that they have a legitimate interest in warning other investors, Counter-Defendants argue further that their First Amendment rights outweigh MPG's alleged interests in obtaining injunctive relief.  *Docket #12* at 24-26.

### 1.    Applicability of First Amendment

Counter-Defendants do not cite any authority or provide any rationale in support of their contention that although they are citizens of the United Kingdom and presently non-residents of the United States, they enjoy First Amendment rights.  Indeed, there is little or no case law directly supporting the proposition that First Amendment rights extend to non-resident aliens.  *See Veiga v. World Meteorological Organization,* 568 F.Supp.2d 367, 373-374(S.D.N.Y.,2008)(rejecting "claims by nonresident aliens located in a foreign sovereign state" for constitutional protections); *Verdugo–Urquidez,* 494 U.S. 259, 268–69, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)(First Amendment rights limited "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"); *see also DKT Memorial Fund Ltd. v. Agency for Intern. Development*  887 F.2d 275, 285-286, 281 U.S.App.D.C. 47, 57 - 58 (D.C.Cir. 1989)(declining to reach the question of whether First Amendment protections extended to nonresident aliens).[2]  The Second Circuit recently

---

[2] The majority opinion in *DKT* was pointed in its skepticism that foreign nationals (in that case, a foreign NGO) outside the United States fall within the "zone of protection" of the First Amendment, yet was constrained to say, "We will not, however, hold as the government urges, that an alien beyond the bounds of the United States never

observed that "case law regarding extraterritorial application of constitutional rights is sparse," but assumed, "without deciding," that Plaintiffs who were "not citizens or lawful resident aliens" could "assert First and Fifth Amendment rights."  *Hedges v. Obama,* 724 F.3d 170, 194, fn 140 (2nd Cir. 2013).

Given the absence of any controlling authority for Counter-Defendants' position, I am hard-pressed to find that non-resident non-citizens are categorically entitled to First Amendment protections.  However, like the majority in *DKT*, I cannot say that there are absolutely no exceptions to the broader rule that denies First Amendment protections to extraterritorial aliens.  This request for a preliminary injunction is an equitable proceeding, and under the present circumstances, enjoining Counter-Defendants from non-defamatory speech pertaining to their experiences with MPG is not appropriate. Placing prior restraints

---

has standing to assert a constitutional claim." *Id*. at 285. Rather, stating that they were "reluctant to announce a rule broader than that necessary to dispose of the exact question before us," the majority held that regardless of whether the plaintiff enjoyed First Amendment protections, it lost on the merits. *Id*. at 286.

In her partial dissent in *DKT*, Judge (now Justice) Ginsburg stated that she "would hesitate long before holding that in a United States-foreign citizen encounter, the amendment we prize as "first" has no force in court." *Id*. at 308.  In 2004, Justice Ginsburg reflected as follows on her *DKT* dissent:

> "In dissent, I resisted the notion that in an encounter between the United States and non-resident aliens, 'the amendment we prize as "first" has no force in court.'  I expressed the expectation that the position taken in the Restatement (Third) of Foreign Relations would one day accurately describe our law. '[W]herever the United States acts,' the Restatement projects, 'it can only act in accordance with the limitations imposed by the Constitution.'"  22 Yale L. & Pol'y Rev. 329, 334 -335 (Spring2004)(footnotes omitted).

on the constitutional protections accorded as a matter of right to their opponents who brought this counter-claim would be inequitable, at least prior to "a judicial finding of fact that any statements are false and libelous." *Karhani v. Meijer,* 270 F.Supp.2d 926, 930, fn 4 (E.D.Mich. 2003)(Borman, J.).   Further, as noted by Counter-Defendants, MPG has hired a publicist, at least in part for the purpose of deflecting unfavorable attention brought on by this lawsuit.   *Docket #12* at 26-27. Granting MPG's request to enjoin Counter-Defendants communications would lead to the inequitable result of allowing MPG to trumpet its position on the dispute while preventing Counter-Defendants from doing likewise.   In the context  of this litigation, Counter-Defendants are shielded by at least limited, or ad hoc First Amendment protections, and should be entitled to the same degree of "free speech" rights accorded to their opponents.

Accordingly, in assessing both the underlying merits of the tortious interference claim and the equities involved in deciding whether to grant a preliminary injunction, significant weight should be given to the First Amendment question.   *County Sec. Agency v. Ohio Dept. of Commerce, supra*.

### 2.   Intentional vs. Legitimate Interference

MPG argues that a preliminary injunction is required to enjoin Counter-Defendants from contacting individuals and entities with which it has either prospective or ongoing business relationships. *Docket #9* at 14-19.  MPG states that on November 29, 2012, Kathryn Llewellyn-Jones sent an email to a MPG investor stating that none of MPG's properties "were refurbished [and] some were dangerous and almost derelict."  *Id.* at 14-15.  MPG

alleges that on May 11, 2013, Kathryn Llewellyn-Jones sent an email to an individual she "knows to be an important business partner" of MPG, referring to MPG's "sordid history" and informing the partner that "you can be held accountable in the future when investors discover they have been duped." *Id.* at 15-16.  MPG states that Mark Llewellyn-Jones sent at followup email to the same entity on May 13  stating that MPG's properties were "virtually worthless on the open market." *Id.* at 16.  The following day, Kathryn Llewellyn-Jones sent another email stating that "All [of MPG's properties] have been subject to massive fines from the Detroit Housing Commission" and that "None of them have produced a genuine rental income." *Id.*

MPG notes that on May 20, 2013, it sent Counter-Defendants' counsel a demand that her clients cease and desist in making "demonstrably false and . . . defamatory" statements to third parties.  *Id.* at 17. MPG notes that despite the demand letter, on June 28, 2013, Kathryn Llewellyn-Jones chastised a local journalist who had recently interviewed Defendant Sameer Beydoun, stating that she was "very disappoint[ed]" that Beydoun was not questioned about the allegations in the present case. *Id.* at 18.  MPG notes  since the time of the third party communications by Counter-Defendants, a prospective investor poised to buy five MPG properties declined to consummate the transactions "after checking the internet" and learning of the "upcoming lawsuit." *Id.*

Counter-Defendants do not contest that they made the following statements: (1) "'homes sold by Metro Property Group have been subject to massive fines from the Detroit Housing Commission,'" (2)  houses sold by Metro Property Group are "'virtually worthless

-15-

on the open market'" and that none of the properties "'have produced a genuine rental income,'" and (3) none of the properties sold by Metro Property Group were refurbished. *Counter-Complaint* at ¶¶ 65-67.

At the September 10, 2013 hearing on this motion, Counter-Defendants' attorney conceded that the statement that MPG properties have been subject to "massive fines by the Detroit Housing Commission" represented a literal misstatement of fact, but pointed out that another government agency imposed substantial fines on multiple properties owned by various Plaintiffs. *Transcript, Docket #41* at 38. Counsel argued that the fact that her clients actually received "Section 8" fines rather than "Detroit Housing Commission" fines was "neither here nor there," noting that Counter-Defendants were living in the United Kingdom, and were only aware that the agent imposing the fines was the "City of Detroit Inspector." *Id.* at 38-39.

As to the statement that the houses were "virtually worthless" and none had produced "a genuine rental income," Counter-Defendants' counsel did not retract her clients' claim that the houses were worthless, stating that the properties were "basically worthless," because "many of the [properties] were not tenantable and never ha[d] been." *Id.* at *32*. MPG's attorney conceded, in effect, that the "virtually worthless" statement could not be immediately disproved, *Id.* at 19, but that a number of the properties owned by MPG produced rental income. *Id.* at 18. Counter-Defendants' attorney responded that her client(s)' statements concerning the lack of "genuine rental income" referred to properties purchased by various Plaintiffs, backing away, in effect, from her clients' claims that *none* of the MPG properties

-16-

had ever produced "rental income." *Id.* at 28-29. However, she stood by the "genuine rental income" statement referred to the Complaint's allegation that Plaintiffs had been presented with false lease documents inflating the amount of rental income actually generated by the properties. *Id.* at 28-29. Counter-Defendants' counsel also qualified her clients' statements that none of the MPG properties had been refurbished, stating that Counter-Defendants' were referring to the condition of the properties at the time of their purchase of the property. *Id.* at 26.

While parties disagree as to whether the speech at issue is defamatory, neither party disputes that defamation does not constitute protected speech. In establishing the third prong of a tortious interference claim, the movant must show that the alleged interference was defamatory. *See Compuware Corp. v. Moody's Investors Services, Inc.* 499 F.3d 520, 530 (6th Cir. 2007)(citing *Unelko Corp. v. Rooney,* 912 F.2d 1049, 1057–58 (9th Cir.1990)(claims of "tortious interference with business relationships" were "subject to the same [F]irst [A]mendment requirements that govern actions for defamation"). MPG could ultimately prevail on its tortious interference claim, and certainly has a possibility of success on the merits. But the test for granting a preliminary injunction is whether MPG has shown a *substantial likelihood* of success. Based on the facts that have been proffered in support of and in opposition to this motion, a trier of fact could reasonably find for either side. While MPG could ultimately prevail on its interference claim, the question of whether Counter-Defendants made the communications with improper motives, or conversely, were motivated by legitimate business reasons is a question for the judicial fact-finder. *Karhani,*

*supra,* 270 F.Supp.2d at 930, fn 4.[3]   Counter-Defendants, at a minimum, have made a plausible argument that they have a legitimate interest in warning potential investors to shun MPG. *Docket #12* at 20. The relative merits being in equipose, it cannot be said that either side has a "substantial likelihood" of success.

### B. Irreparable Harm, Substantial Harm to Others, and the Public Interest

The remaining factors to be considered in granting injunctive relief also militate against enjoining Plaintiffs from communication with MPG's prospective or current business relationships.

In recommending against injunctive relief, the Court notes MPG's argument that the potential "[l]oss of goodwill is sufficient to establish an irreparable injury" by the party moving for injunctive relief. *Brief* at 23 (citing *Lowry Computer Products, inc. v. Head,* 984 F. Supp. 1111, 1116 (E.D. Mich 1997)).   MPG alleges that as a result of Counter-Plaintiffs' interference, at least one prospective client has declined to consummate a real estate

---

[3] *Karhani* stated, "Courts have long held that 'equity will not enjoin a libel' absent extraordinary circumstances. *Metropolitan Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 239 F.3d 172, 177 (2d Cir.2001) (discussing numerous cases). As discussed infra, extraordinary circumstances do not exist in this case. The Sixth Circuit has, however, permitted an injunction in very limited circumstances—the court has allowed a permanent injunction for statements found by the trier-of-fact to be libelous. See *Lothschuetz v. Carpenter* 898 F.2d 1200, 1209 (6th Cir.1990) (Wellford, J., for the court, concurring in part, dissenting in part). Thus, while the Sixth Circuit has permitted a remedial injunction for statements found by the trier of fact to be libelous, the circuit has never departed from the general rule prohibiting unconstitutional prior restraints with respect to temporary restraining orders and/or preliminary injunctions absent extraordinary circumstances. In the instant case, there has not been a judicial finding of fact that any statements are false and libelous."

transaction until the present lawsuit is resolved.   However, MPG does not allege that the
individual withdrew because he was contacted by Counter-Defendants, but rather, because
he "check[ed] the internet and the upcoming lawsuit." *Brief* at 18.   The fact that Counter-
Defendants' attorney has already "walked back" or clarified the disputed inaccuracies in her
clients' prior communications also undermines MPG's position that it faces irreparable harm
if the requested injunction is not granted.[4]  *Karhani v. Meijer*  270 F.Supp.2d 926, 933, fn 6.
Potential harm to MPG's interests is also mitigated by the fact that it has hired a publicist to
present its side of the dispute.

      The alleged irreparable harm to MPG must also be balanced against the substantial
harm to current and potential investors.   To be sure, the allegations contained in the original
Complaint are vigorously contested by MPG.   However, Plaintiffs/Counter-Defendants have
provided exhibits in response to this motion and with the Complaint supporting their
allegations that MPG overstated both the amount of money collected in rental payments and

---

[4]

      Nonetheless, the Court notes with concern that Counter-Defendants' response to the
present motion contains careless and completely speculative statements.   Counter-Defendants
contest affidavits submitted on behalf of MPG's motion on the premise that the authors were
"bought" with large donations. *Docket #12* at 11 (citing *Docket #9, Exhibit* 5).   The Very
Reverend Stephen H. Bancroft, retired Dean of the Cathedral Church of St. Paul in Detroit
was among the individuals submitting affidavits.   Counter-Defendants' counsel provides no
support for her contention that the retired clergyman or any of the other affiants offered
perjured testimony in exchange for a "donation."   The question of whether these assertions
constitute defamation or instead, "opinionated and hyperbolic screed," is not presently
before the Court. *Schnare v. Ziessow,*  104 Fed.Appx. 847, 852, 2004 WL 1557804, *5 (4th
Cir. June 13, 2004).

their refurbishment activities in marketing their properties.   The interest in averting potential harm to others, combined with my own finding that Plaintiffs are entitled to provide non-defamatory information about their own experiences, outweighs the alleged harm to MPG's business interests.   *Karhani,* 270 F.Supp.2d at 930.

Moreover, notwithstanding the merits of the counter-claim, the alleged harm Counter-Defendant's "communications have done and will do" to MPG's "business interests and their reputations" cannot override Counter-Defendants' entitlement to the same right to free speech accorded to their    opponent.   *Thompson v. Hayes,* 748 F.Supp.2d 824, 831 (E.D.Tenn.2010)(citing *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419–20, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971)).[5]

In closing, my recommendation should not be read to suggest that MPG does not have

---

[5] When the moving party is a "public figure," it "has the additional burden of showing clear and convincing evidence of actual malice on the part of the [non-movant]." *Armstrong v. Shirvell,* 2013 WL 4833948, *2 (E.D.Mich. September 11, 2013)(Tarnow, J.)(citing *Faxon v. Michigan Republican State Cent. Comm.*, 244 Mich.App. 468, 474, 624 N.W.2d 509 (2001)). "Actual malice means that the 'injurious falsehood was made knowing that it was false or with reckless disregard for whether it was true.'" *Id.* MPG's statement that it is "a global organization,"along with Defendant CEO Sameer Beydoun's interview with local media personalities and the hiring of a publicist would suggest that MPG is at least a "limited purpose" public figure. *LL NJ, Inc. v. NBC-Subsidiary (WCAU-TV),* L.P.  2008 WL 1923261, *19 (E.D.Mich. April 28, 2008)(Lawson, J.)(citing *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 274 (3d Cir.1980)).

However, the Court declines to make a determination as to whether MPG is a public figure.  None of the parties has provided guidance as to whether MPG is a public figure, much less whether Counter-Plaintiff is either a "general-purpose" or "limited purpose" public figure.   Moreover, the question of whether MPG is a public figure does not affect my recommendation.

-20-

a viable claim of interference.  Further, MPG would be entitled to damages should it prevail on its counterclaim . *Karhani,* 270 F.Supp.2d at 933, fn 6.   However, factual disputes as to the allegations in the Complaint and Counter-Defendants' motives, coupled with a longstanding policy against prior restraints, support the denial of the present motion.

### IV.   CONCLUSION

For these reasons, I recommend that Defendant/Counter-Plaintiff's Motion for Preliminary Injunction [Docket #9] be DENIED.

Any objections to this Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 13, 2014                    s/R. Steven Whalen
                                         R. STEVEN WHALEN
                                         UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on
March 13, 2014, electronically and/or by U.S. mail.

                                         s/Michael Williams
                                         Case Manager to the
                                         Honorable R. Steven Whalen